UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY M. MCCABE,<br><br>                Plaintiff,<br><br>     v.<br><br>PATRICK J. HART (CHIEF DEPUTY DISTRICT ATTORNEY, OFFICE OF THE DISTRICT ATTORNEY, COUNTY OF KINGS); RONALD L. CALHOUN (DISTRICT ATTORNEY, COUNTY OF KINGS); THE COUNTY OF KINGS, CALIFORNIA,<br><br>                Defendants. | 1:03-CV-05298-OWW-SMS<br><br><br>MEMORANDUM DECISION RE GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 76) |

### 1.   Introduction

Defendants The County of Kings, California ("Kings County"), Patrick J. Hart, Chief Deputy District Attorney ("CDDA Hart") and Ronald L. Calhoun, Deputy District Attorney ("DDA Calhoun") move for summary judgment in favor of Defendant DDA Calhoun pursuant to Federal Rule of Civil Procedure 56(b).  The summary judgment covers the last remaining cause of action, against the last remaining defendant in the suit, a Section 1983 claim against Defendant DDA Calhoun for malicious prosecution.  The matter was submitted on the pleadings.

### 2.   Procedural History

On March 11, 2003, Plaintiff Jeffrey M. McCabe ("McCabe") filed suit against Kings County DDA Calhoun, Kings County CDDA Hart, and Kings County for violations of his constitutional

1

rights.  Plaintiff's complaint alleges claims for
unconstitutional false arrest (claim I), unconstitutional
malicious prosecution (claim II); declaratory relief for false
arrest and malicious prosecution (claim III); violation of
California Civil Code § 52.1 (claim IV); and false arrest (claim
V).  (Doc. 1, Complaint)

On May 18, 2004, the Court granted in part and denied in
part Defendants' motion for summary adjudication.  (Doc. 33)  The
remaining claims after the motion for summary judgment included:
(i) Plaintiff's third claim for declaratory relief from Defendant
DDA Calhoun in his official capacity; (ii) Plaintiff's first and
second claims alleging violations of his Fourth Amendment rights
against false arrest and malicious prosecution; and (iii)
Plaintiff's third claim for relief seeking a declaration that
Defendants violated Plaintiff's Fourth Amendment right against
false arrest.

On May 25, 2004, Defendants moved for reconsideration of the
Court's May 18, 2004 order.  In an order dated September 10,
2004, the Court ordered that summary adjudication be granted in
favor of Defendants as to Plaintiff's third claim for declaratory
relief in its entirety.  (Doc. 46)

On September 15, 2004, Defendants filed a motion for
clarification of the Court's previous orders.  (Doc. 47)  On
September 17, 2004, the Court ordered that summary adjudication
was granted in favor of Defendants as to Plaintiff's claims for
false arrest found in claims one, three, five in Plaintiff's
Complaint.  (Doc. 50)

On March 18, 2005, Defendants filed a motion for summary

judgment on the remaining second claim of malicious prosecution against the remaining Defendant DDA Calhoun.  (Doc. 76, Motion for Summary Judgment)  On April 1, 2005, Plaintiff filed an opposition to the Motion for Summary Judgment.  (Doc. 79, Opposition)  On April 11, 2005, Defendants filed their reply to the Opposition.  (Doc. 81, Reply)  After a series of stipulations and orders, Plaintiff filed a second opposition on November 11, 2005.  (Doc. 94, Opposition II)  On November 22, 2005, Defendants filed a reply to Plaintiff's second opposition.  (Doc. 96, Reply II)  The matter was submitted on the pleadings December 12, 2005.  (Doc. 97)

### 3.   Factual Background

#### A.   UNDISPUTED FACTS

On March 1, 2002, during the course of a traffic stop involving suspect Peter Contreras, Plaintiff Lemoore Police Officer Jeffrey J. McCabe shot Mr. Contreras who died at the scene.  Doc. 76, Defendants Statement of Undisputed Facts, "DSUF", #1.  Defendant DDA Calhoun, at all times relevant to this lawsuit, was the District Attorney of the Kings County.  DSUF #2.  Before hearing of the shooting incident, Defendant DDA Calhoun had never heard of Plaintiff, nor, to his knowledge, had they ever had any personal contact.  DSUF #41.

Defendant DDA Calhoun was notified by Investigator Larry Orth of the subject shooting the day (early morning hours) that it occurred.  DSUF #3.  Defendant DDA Calhoun understood that Investigator Orth was already investigating the incident.  DSUF #4.  That morning following the shooting incident, Defendant DDA Calhoun met with Investigator Orth and Deputy District Attorney

("DDA") Mike Reinhart to discuss the status of the case.  DSUF #5.  At that point, Defendant DDA Calhoun reassigned Investigator Larry Ponting and Investigator Randy Ebner to the investigation.  DSUF #6.

Defendant DDA Calhoun never drafted any reports concerning any aspect of the shooting investigation, nor inspected the scene of the shooting.  DSUF ##9-10.  Defendant DDA Calhoun did not prepare any diagrams recreating the scene of the shooting, nor did he take any pictures of the scene of the shooting.  DSUF ##11-12.

On March 12, 2002, 11 days after the shooting, Defendant DDA Calhoun suffered a stroke and was officially out of the office for six weeks.  DSUF #13.  Defendant DDA Calhoun continued to receive updates from Investigator Ponting during the time he was officially out of the office.  Doc. 93, Plaintiff's Statement of Undisputed Facts, "PSUF", #13.

On or about April 1, 2002, Defendant DDA Calhoun returned to work to review the investigative packet concerning the shooting.  DSUF #19.  This is the first time that Defendant DDA Calhoun saw any written documentation concerning the investigation.  DSUF #20.  When Defendant DDA Calhoun returned to the office, he received updates on the status of the investigation by District Attorney's Office Investigators.  DSUF #14.  Defendant DDA Calhoun received an additional three to four verbal updates from Investigator Ponting during the time that he reviewed the investigative packet.  DSUF #21.

*April 2002 Meeting*

During the month of April of 2002, Defendant DDA Calhoun

**4**

attended a meeting with Investigator Ponting and other senior attorneys from the District Attorney's Office in which the Contreras shooting was discussed to determine what action, if any, the District Attorney's Office should take with regards to the shooting.  DSUF #22.

### *April 18, 2002 Press Release*

Shortly after the decision was made to criminally prosecute Plaintiff, the Kings County District Attorney's Office, through CDDA Hart, issued a press release.  DSUF #15.  The press release stated in part, "This decision to file criminal charges was made only after many hours of investigation among the senior staff of the District Attorney's Office, including Ron Calhoun."  DSUF #16.

### B.   DISPUTED FACTS

Defendants contend that at no time did DDA Calhoun direct the District Attorney's Office investigation, nor did he give any direction to any District Attorney Investigators in terms of how to conduct the investigation.  DSUF #7.  Defendants contend that DDA Calhoun never directed that any witnesses be interviewed; never interviewed any witnesses to the shooting; did not attend any witness interviews; nor did he ever have contact with any witnesses.  DSUF #8.

### *"Thorough Investigation" Comments*

Plaintiff states that DDA Calhoun testified that he instructed Investigator Orth to get an investigator on the case full-time and further stated, "let's make sure it's a thorough investigation."  2005 Calhoun Depo. 6:7-15, 8:17:22.  Defendant DDA Calhoun did not go into detail on what he meant by this

statement because "they knew what I wanted."  2005 Calhoun Depo. 8:23-9:7.

Defendant DDA Calhoun stated that he didn't know any of the witnesses and he didn't identify anybody for Investigator Ponting to talk to during his investigation.  2005 Calhoun Depo. 14:18-15:8.

### *Updates from Investigators*

Between the period March 1 through March 11, Defendant DDA Calhoun received a status report probably four to five times from Investigator Ponting or Investigator Ebner.  2005 Calhoun Depo. 16:13-18.  DDA Calhoun testified that he did not make any comments indicating his opinion as to whether or not additional work needed to be done.  2005 Calhoun Depo. 16:19-23.

### "*That was good. Keep doing it*" Comment

Defendant DDA Calhoun testified that when the investigators would tell him what was going on and lay it out in terms of what they were going to do, in response he would tell them "that was good.  Keep doing it."  2005 Calhoun Depo. 17:10-17-18:1-3.

### "*Get all the witnesses you can*" Comment

After the investigators came back from viewing the vehicle, specifically Investigator Ebner told him they viewed the vehicle, reviewed the autopsy report and found the location of the bullet, Defendant DDA Calhoun said to Investigator Ponting "get all the witnesses you can."  2005 Calhoun Depo. 18:12-17; 19:9-14.

### *Investigator Ponting's Thoughts on Prosecution*

Defendant DDA Calhoun understood that Investigator Ponting did not want the case to go to court.  2003 Calhoun Depo. 19:21-20:2.  The day before they filed the action, Investigator Ponting

**6**

came over to Defendant DDA Calhoun's house and asked if they really had to file against Plaintiff McCabe.  When asked if there was a reason not to, he couldn't.  2003 Calhoun Depo. 14:21-15:4.

Plaintiff cites Investigator Ponting's May 10, 2002 memorandum that stated McCabe felt his life was in danger after Mr. Contreras appeared to be backing up directly in McCabe's direction, and McCabe fired one shot into the vehicle not knowing whether or not he actually struck Mr. Contreras.  PSUF #29. Plaintiff also claims the California DOJ and FBI recommended no charges be made.  PSUF #30

*Defendant DDA Calhoun's Probable Cause Basis*

Defendant DDA Calhoun contends he learned the following through a review of the shooting investigation, as well as the briefings provided by Investigator Ponting: (1) One of the two witnesses who was closest to the shooting, Francisco Alvarez, when asked during his interview with Investigator Ponting, whether Mr. Contreras' car was moving closer to Plaintiff McCabe or moving away from him when McCabe fired, responded, the car was nowhere near the officer, that it wasn't even going to come close to hit the offcer.  DSUF #24.

Defendant DDA Calhoun contends that he was informed by Investigator Ponting that Plaintiff McCabe had stated that he shot through the rear window of Mr. Contreras' car because Mr. Contreras was backing up at a high rate of speed towards him. DSUF #29.  Defendant DDA Calhoun asserts other eyewitness statements contradict this scenario, claiming the car was not going anywhere or the car was trying to leave.  DSUF ##25-28. Defendant DDA Calhoun contends that the physical evidence

**7**

indicated that McCabe shot Mr. Contreras through the driver's side window and was therefore inconsistent with Plaintiff McCabe's description of Mr. Contreras backing up towards him when he fired.   Certain witnesses also did not feel McCabe was in danger, including a witness on the street.   DSUF ##31-33.

Defendant DDA Calhoun relied on the autopsy results and physical evidence that indicated that Mr. Contreras was shot on the left side of his torso and that the bullet traveled at a downward angle through Mr. Contreras' body, exiting on the right side of his body and that the rear window of the vehicle was intact.   DSUF #30.

After reviewing the investigative materials, being briefed by Investigator Ponting, and discussions with other senior attorneys, it was Defendant DDA Calhoun's legal opinion that Plaintiff McCabe had committed second degree murder.   DSUF #35.

Defendant DDA Calhoun contends that both he and CDDA Hart agreed it would be very difficult to prove that Plaintiff was acting with malice and therefore an objective fact-finder would not convict on murder charges.   He therefore declined to file these charges based upon the Uniform Crime Charging Standards. DSUF #36.   Defendant DDA Calhoun ultimately decided to charge Plaintiff with voluntary manslaughter, as there did not appear to be any premeditation on Plaintiff's part, and because it was believed that Plaintiff had an honest fear for his safety, but his fear was unreasonable.   DSUF #37.   Defendant DDA Calhoun remained apprised of the status of the case as it progressed, did not file the criminal complaint, nor did he appear in court on behalf of the District Attorney's Office during the subsequent

1   prosecution.   DSUF #38.

2       *April 2002 Staff Meeting*

3       At the April 2002 meeting Defendants contend, charges of
4   second degree murder, voluntary manslaughter and involuntary
5   manslaughter were discussed, as well as the option of not filing
6   any charges.   DSUF #23.   Plaintiff states that at the April 2002
7   meeting not everyone at the meeting agreed charges should be
8   filed.   PSUF #23.   Plaintiff contends DDA Reinhart testified that
9   he advised at the April 2002 meeting that he didn't believe they
10  could convince 12 jurors beyond a reasonable doubt that any crime
11  had been committed by Plaintiff McCabe.   PSUF #30, Reinhart Depo.
12  31:1-4.   CDDA Hart believed that the case was very close and
13  should go to the jury.   PSUF #30; Hart Depo. 68:2-21.   DDA Burns,
14  who did not attend the meeting, disagreed with the filing of the
15  charges since the physical evidence did not match up.   He
16  believes he relayed it to DDA Gularte to state at the April 2002
17  meeting but does not know if this happened.   PSUF #30; Burns
18  Depo. 9:1-25 -10:14.   DDA Hart testified that Defendant DDA
19  Calhoun did not express an opinion as to how the case should be
20  handled; DDA Reinhart was in favor of filing second degree murder
21  charges; DDA Gularte felt that no charges should be filed.   Hart
22  Depo. 29:14-33:9.

23      *April 18, 2002 Press Release*

24      Defendant DDA Calhoun knew there was going to be a press
25  release and testified at his deposition that he told CDDA Hart
26  that they should mention that Mr. Contreras was in possession of
27  methamphetamine.   2003 Calhoun Depo. 18:10-17.   CDDA Hart
28  drafted the press release and Defendant DDA Calhoun approved the

**9**

press release before it went out.   PSUF #7; Hart Depo. 67:18-23.
Defendants allege that the statements in the press release, meant
that several members of the District Attorney's staff, including
Defendant DDA Calhoun, researched the law regarding the use of
deadly force, while the investigation into the facts of the
shooting was conducted entirely by Investigator Ponting,
Investigator Ebner, and the Lemoore Police Department.   DSUF #17.
The press release reference to Defendant DDA Calhoun was not
intended to mean that he was involved in the factual
investigation of the subject shooting.   DSUF #18.

> *Signing of Criminal Complaint: CDDA Hart*

Investigator Ponting did not sign the criminal complaint.
CDDA Hart personally drafted the criminal complaint.   Hart Depo.
40:25-41:2.   CDDA Hart testified about Investigator Ponting not
signing the criminal complaint:

> Q.  If you had asked Mr. Ponting to sign the criminal
> complaint, do you believe that he would have refused?
> A. No, I can't answer for Mr. Ponting.   It's
> hypothetical to the extreme because I wouldn't – I
> wouldn't do that.   I'm not going to ask somebody to do
> something they don't believe in.

Hart Depo. 52:16-21.   CDDA Hart stated that in every case
submitted by prosecutors for review by investigators, there is a
"face sheet" or transmittal that recommends certain criminal
charges.   In this case there was no such document submitted by
the investigators in this case.   Hart Depo. 47:5-48:10.   CDDA
Hart stated that such recommendation may or may not be necessary,
as sometimes they disagree with the recommended charge and other
times the district attorney will find they have all the elements
and more.   Their independent review is helpful but not a

controlling factor.   Hart Depo. 47:14-48:3.

After the criminal case was filed against Plaintiff, Defendant DDA Calhoun did not actively oversee CDDA Hart's handling of the case.   DSUF #39.   Defendant DDA Calhoun claims that in making the determination to prosecute Plaintiff, he did not act out of any feelings of malice or ill will.   DSUF #40.

*Preliminary Hearing*: *No Probable Cause*

At the preliminary hearing, Judge Maciel, after being presented with all the evidence, including testimony from fourteen witnesses, specifically law enforcement officers, civilians and one expert, found there was no probable cause to hold Plaintiff to answer to the charges.   PSUF #24.

*CDDA Hart's Conversation with Lemoore Police Department*

Both Chief Morrell of the Lemoore Police Department and Commander Laws, of the Lemoore Police Department had a conversation with CDDA Hart while waiting for Judge Maciel to rule in the preliminary hearing.   DDA Hart informed them that the case against Plaintiff McCabe should not make it past the preliminary hearing and if it does he would not file an information to proceed to trial.   He told them he was helping them in their civil case.   PSUF #40; Morrell Depo. p.7-8; Laws Depo. p.9-10. Defendants object to this testimony on hearsay grounds.   The objection is overruled on the ground that the statement is by a party and is arguably against the speaker's interests.

*Decision not to Prosecute*

After the preliminary hearing before Judge Maciel, Defendant DDA Calhoun testified in his deposition that he didn't believe he

1  could get a conviction, based on the lack of strength of their

2  testimony.  PSUF #35; Calhoun Depo. 38:6-25.  CDDA Hart also

3  testified that after the evidence was put on in the preliminary

4  hearing before Judge Maciel, he determined that it was unlikely

5  that they would convince twelve (12) King County jurors that a

6  police officer could be convicted given the state of the

7  evidence.  PSUF #35; Hart Depo. 54:10-55:11.

8                      4.   Legal Standard

9       Plaintiff's Complaint, brought pursuant to 42 U.S.C. § 1983,

10  alleges violations of his Fourth Amendment rights prohibiting

11  malicious prosecution.  The last remaining cause of action is

12  against the remaining defendant, DDA Calhoun.  Plaintiff alleges

13  that Defendant DDA Calhoun maliciously prosecuted Plaintiff in

14  violation of his federal constitutional rights.  Defendants

15  contend that undisputed facts establish as a matter of law that

16  Defendant DDA Calhoun is entitled to absolute prosecutorial

17  immunity or, in the alternative, qualified immunity.  They also

18  argue there is no evidence of malice, an element of a malicious

19  prosecution claim, therefore they move for summary judgment on

20  these grounds.

21       A.   Summary Judgment

22       Summary judgment is warranted only "if the pleadings,

23  depositions, answers to interrogatories, and admissions on file,

24  together with the affidavits, if any, show that there is no

25  genuine issue as to any material fact."  Fed.R.Civ.P. 56(c); *Cal.*

26  *v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998).  Therefore, to

27  defeat a motion for summary judgment, the non-moving party must

28  show (1) that a genuine factual issue exists and (2) that this

factual issue is material.  *Id.*  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell,* 138 F.3d at 782 (*quoting Anderson,* 477 U.S. at 248). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex Corp. v. Catrell,* 477 U.S. 317, 322-23 (1986).

The more implausible the claim or defense asserted by the non-moving party, the more persuasive its evidence must be to avoid summary judgment.  *See United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the

13

nonmoving party.  *Anderson,* 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial.  *See Abdul-Jabbar v. G.M. Corp.,* 85 F.3d 407, 410 (9th Cir. 1996).

### B.   Immunity

Prosecutors are afforded certain immunities from litigation, that existed at common law.  Any immunity questions should be resolved at the earliest possible stage of litigation.  *Hunter v. Bryant*, 502 U.S. 224 (1991)(per curiam); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)(where a case is erroneously permitted to go to trial, the immunity would have been effectively squandered).

### I.   Absolute Immunity

In determining whether "to accord a prosecutor immunity from a civil suit for damages, a court must first determine whether a prosecutor has performed a quasi-judicial function.  *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003).

A prosecutor's acts before, during, and after trial are fully protected by absolute immunity when the prosecutor is "performing the traditional functions of an advocate."  *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997).  Such activity is sometimes called "quasi-judicial" conduct or "prosecutorial immunity."  *Genzler v. Loganbach*, 410 F.3d 630, 637 (9th Cir. 2005).  As a general rule, absolute immunity applies to acts "having more or less connection with the general matters committed to [the prosecutor's] control or supervision."  *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 678 (9th Cir.

**14**

1984).   A prosecutor is afforded absolute immunity for initiating
a prosecution.   *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)
(absolute immunity applies to liability under § 1983 when a
prosecutor's actions are intimately associated with the judicial
phase of the criminal process).

A prosecutor is absolutely immune "from liability for
failure to investigate the accusations against a defendant before
filing charges." *Broam,* 320 F.3d at 1029.   Introducing testimony
at the preliminary hearing without investigating its credibility,
failure to present exculpatory evidence at the preliminary
hearing, and failure to dismiss the charges after learning new
information, "[v]iewed in isolation, these separate claims all
relate to prosecutorial activities for which courts have granted
absolute immunity." *Morley v. Walker*, 175 F.3d 756, 760 (9th
Cir. 1999).   The burden rests on the official seeking immunity to
demonstrate "immunity attaches to a particular function." *Id.* at
759.

## II.   Qualified Immunity

"A court may grant a prosecutor qualified immunity if the
prosecutor's conduct as an investigator satisfies the two-step
test for qualified immunity outlined by the Supreme Court in
Saucier..." *Broam*, 320 F.3d at 1028.   First, a court must ask
whether a constitutional violation occurred at all.   If the
answer to this question is yes, the court must then inquire
whether the right violated was "clearly established" by asking
whether a reasonable officer could believe that the defendant's
actions were lawful. *See Saucier v. Katz*, 533 U.S. 194, 201
(2001).

1    The traditional summary judgment approach should be used in

2    analyzing the first step of the *Saucier* analysis:

3         A court required to rule upon the qualified immunity
          issue must consider, then, this threshold question:

4         Taken in the light most favorable to the party
          asserting the injury, do the facts alleged show the

5         officer's conduct violated a constitutional right?
          Where the facts are disputed, their resolution and

6         determinations of credibility are manifestly the
          province of a jury.

7
*Wall v. County of Orange*, 364 F.3d 1107, 1110-1111 (9th Cir.

8
2004) (internal citations and quotations omitted).  In the second

9
step, the court must ask whether it would be clear to a

10
reasonable officer that his conduct was unlawful in the situation

11
confronted.  Although this inquiry is primarily a legal one,

12
where the reasonableness of the officer's belief that his conduct

13
was lawful "depends on the resolution of disputed issues of fact

14
... summary judgment is not appropriate."  *Wilkins v. City of*

15
*Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) (*citing Saucier*, 533

16
U.S. at 216 (Ginsburg J., concurring)).

17
               5.   Legal Analysis

18    Plaintiff asserts a Section 1983 claim against Defendant DDA

19
Calhoun for malicious prosecution.  "The text of the [Section

20
1983] statute purports to create a damages remedy against every

21
state official for the violation of any person's federal

22
constitutional or statutory rights."  *Kalina*, 522 U.S. at 123.

23
Title 42 U.S.C. § 1983 provides:

24
          Every person who, under color of any statute,

25        ordinance, regulation, custom, or usage, of any State
          or Territory or the District of Columbia, subjects, or

26        causes to be subjected, any citizen of the United
          States or other person within the jurisdiction thereof

27        to the deprivation of any rights, privileges, or
          immunities secured by the Constitution and laws, shall

28        be liable to the party injured in an action at law,

16

suit in equity, or other proper proceeding for redress ...

42 U.S.C. § 1983.   Under a Section 1983, malicious prosecution claim, proof is required that the prosecution, or initiating of prosecution, was without probable cause, with malice, and for the purpose of denying some other specific constitutional right, such as the right to equal protection or the right to due process. *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

Plaintiff contends there was no probable cause for initiation of prosecution by Defendant DDA Calhoun and it was done with malice, in violation of his constitutional rights. Plaintiff refers to evidence that CDDA Hart told others that the case was being filed not because probable cause existed and a conviction was sought, but rather for the benefit of the "public view" and an anticipated civil suit.   Plaintiff points to deposition testimony of Kim Morrell of Lemoore Police Department, J.R. Law of the Lemoore Police Department, CDDA Hart and Defendant DDA Calhoun.   However, nowhere in any of the referenced testimony is there evidence that the case was maliciously filed, without probable cause to support a charge of voluntary manslaughter.   None of this information is attributable to Defendant DDA Calhoun.   Defendant Hart is no longer a defendant in this suit.   *See* Doc. 33.   Under civil rights law DDA Calhoun cannot be held vicariously liable for Defendant CDDA Hart's statements or CDDA Hart's actions with Mr. Law and Ms. Morrell.

Plaintiff also contends that CDDA Hart and DDA Calhoun were aware that the lead investigator Larry Ponting concluded there was no probable cause for filing criminal charges against

17

1   Plaintiff and cite to Larry Ponting's written statement, that

2   concludes that Plaintiff McCabe "was definitely in fear for his

3   life when he fired the shot..."  Doc. 17, Plaintiff's Statement

4   of Undisputed Facts in Opposition to Defendants Motion for

5   Summary Judgment, Exhibit 1, Ponting Statement, May 10, 2002, p.

6   20, filed March 19, 2004.  Mr. Ponting stated earlier in his

7   summary of the events: "The last time Contreras appeared to be

8   backing up directly in McCabe's direction at which time McCabe

9   felt that his life was in danger, as the vehicle approached he

10  feels that at this time he may have side stepped the vehicle and

11  fired one shot into the vehicle not knowing whether or not he had

12  actually struck Mr. Contreras.  Ponting Statement, p. 6.

13      Plaintiff also refers to Mr. Law testimony about a

14  conversation with Mr. Ponting, in which Mr. Ponting told Mr. Law

15  that he, Mr. Ponting, believed that Officer McCabe feared for his

16  life at the time the car was backing up at him and that the use

17  of force was justifiable.  Law Depo. 5:15 - 6:1.  Plaintiff also

18  cites testimony of CDDA Hart that Mr. Ponting testified that he

19  concluded that Plaintiff McCabe was acting to protect himself or

20  other people.  Hart Depo. 52:22-53:3.[1]  Plaintiff also states

21  that DDA Reinhart testified that there were unresolved factual

22  issues that never were clarified to his satisfaction in the April

23  2002 staff meeting that he feels should have been addressed

24

25

26      [1]  Plaintiff cites Ms. Morrell's testimony, but the cite
    does not reference Mr. Ponting.  Plaintiff cites DDA Mr. Burns'
27  testimony, but the cite does not reference Mr. Ponting.
    Defendant DDA Calhoun's testimony does not describe any thought
28  by Mr. Ponting whether there is probable cause.

18

1  before they got to the legal issues.  Reinhart Depo. 37:1-38:25.

2  Specifically, he was concerned that with the time delay in the

3  pulling of the trigger and how it fit in.  "The car's moving

4  forward, the shot is almost directly perpendicular to the

5  officer.  If you look the other way, the pattern of the glass out

6  of the window, there's a good distance between the sidewalk and

7  where the bullet looks like it impacted ... glass breakage

8  evidence is kind of tricky.  It's not very exact science, but it

9  does tend to indicate that there was a good deal of distance

10 between, you know, the sidewalk and where the car was ... we

11 really don't know how close McCabe was or was not to that car

12 when the bullets were fired."  Reinhart Depo. 37:6-18.

13      Plaintiff also argues that the California DOJ and the FBI,

14 recommended no charges be filed.  Defendants object to the cited

15 testimony on hearsay grounds but also state that there is no

16 evidence that the FBI and California Department of Justice made

17 these recommendations before the charges were filed.  Defendants

18 assert that Plaintiff provided no evidence these recommendations

19 were made or communicated before the charges were filed and CDDA

20 Hart testified that he believed that these agencies made their

21 decision based solely on the Lemoore Police Department reports

22 and if CDDA Hart had submitted materials, he would have submitted

23 more than the reports that described citizen interviews of people

24 in their cars and two Hispanics at the scene.  This is not

25 covered in the Lemoore Police Department report.  Hart Depo.

26 75:6-76:4.

27      Plaintiff also asserts as evidence that Judge Maciel found

28 no probable cause existed to hold Plaintiff McCabe to answer to

with voluntary manslaughter at the preliminary hearing.  Doc. 21, RT, May 21 and 22, 2002, p. 295-301.  Defendants respond that Judge Maciel's decision is not relevant to the decision to originally file charges, because the decision to prosecute was made prior to the preliminary hearing and was based on the Lemoore Police Department and District Attorney's Office investigations.

Plaintiff asserts that Defendant CDDA Hart, who is a not subject of this motion, and Defendant DDA Calhoun violated Plaintiff's rights by acting as the complaining witness and falsely or recklessly attesting to the existence of probable cause.  No fact establishes that Defendant DDA Calhoun was the complaining witness nor falsely or recklessly attested to the existence of probable cause.  Defendant DDA Calhoun's signature is not on the complaint.

Defendant DDA Calhoun asserts there was evidence that provided probable cause to prosecute Plaintiff McCabe and the evidence was sufficient to establish probable cause.  He describes one witness who was close to the shooting who did not think the car was near Plaintiff McCabe and that Mr. Contreras was not going to hit McCabe. DSUF #24.  Another witness stated that the car was not going anywhere from their point of view. DSUF #25.  Another witness stated that Plaintiff McCabe was standing anywhere from six feet to fifteen feet away from the car and Mr. Contreras was starting to pull away, not moving toward Plaintiff.  DSUF #26.  One witness told Investigator Ponting that Mr. Contreras was pulling out trying to leave when McCabe fired. DSUF #27.  Another witness stated to Officer M. Gonzales of the

Lemoore Police Department, that it did not appear Mr. Contreras was trying to hit or drive at Plaintiff and Plaintiff was always on the left side of the Contreras's vehicle.  DSUF #28. Defendant DDA Calhoun, last, was told by Investigator Ponting that Plaintiff had told him that he shot through the rear of Mr. Contreras car because Mr. Contreras was backing up at a high speed of rate.  DSUF #29.  However, the autopsy results and physical evidence indicated Mr. Contreras was shot on the left side of his torso and the bullet traveled at a downward angle through Mr. Contreras body, exiting on the right side of his body.  This is consistent with a left to right path for the bullet.  The rear window was intact.  DSUF #30.

Defendant DDA Calhoun states that based on his review of the investigative material, briefing by Investigator Ponting, and his discussion with other senior prosecutors from the District Attorney's Office, it was his legal opinion that the evidence supported second degree murder.  DSUF #35.  Because he, along with CDDA Hart agreed it would be difficult to prove Plaintiff acted with malice, it was unlikely an objective fact-finder would convict on murder charges and no murder charge was filed.  DSUF #36.  DDA Calhoun ultimately decided to charge Plaintiff with voluntary manslaughter, since there was no premeditation on Plaintiff's part, and Plaintiff had an honest fear for his safety.  DSUF #37.

I.    Absolute Immunity

Defendant DDA Calhoun is entitled to absolute immunity for his "determination that the evidence was sufficiently strong to justify a probable-cause finding" and his "decision to file

21

charges." *Kalina*, 522 U.S. at 130. "Defending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Imbler*, 424 U.S. at 425-26.

Immunity from prosecution is provided in the "interest in protecting the prosecutor from harassing litigation that would divert his time and attention from his official duties and the interest in enabling him to exercise independent judgment when 'deciding which suits to bring and in conducting them in court.'" *Kalina,* 522 U.S. at 125, *quoting Imbler*, 424 U.S. at 424. If the action of the prosecutor was part of the judicial process, "the prosecutor is entitled to the protection of absolute immunity whether or not he or she violated the civil plaintiff's constitutional rights." *Broam*, 320 F.3d at 1029. Absolute immunity is most clearly applied to all acts taken by a prosecutor to prepare for the initiation of judicial proceedings or for trial and which occur within the role of an advocate, such as Defendant DDA Calhoun's actions cited as evidence above. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). All of Defendant DDA Calhoun's actions evaluating evidence and analyzing whether to and what charges to file are inherently prosecutorial functions that cannot be second-guessed or interfered with.

II.   Qualified Immunity

"Investigatory or administrative functions, on the other hand, generate only qualified immunity." *Morley*, 175 F.3d at 759. Plaintiff cites the evidence that Defendant DDA Calhoun assigned Investigator Ponting, to be in charge of the investigation and requested a wide-ranging pre-filing objective

investigation.  Such supervision, Plaintiff argues is an
administrative function rather than a quasi-judicial function.
Plaintiff also references Defendant DDA Calhoun's deposition
testimony that instructed personnel at the investigation stage to
conduct a "thorough investigation."  "And I just said, 'Let's
make sure it's a thorough investigation.'"  2005 Calhoun Depo.
8:17-22.  He testified that he meant that it entails all efforts
to locate witnesses, all efforts to interview witnesses, and all
efforts to obtain pertinent surveillance footage.  2005 Calhoun
Depo. 8, 14-15.  Defendant DDA Calhoun stated to Investigator
Orth and Investigator Ponting that they should do a "thorough"
investigation," he did not go into detail with them about what he
meant.  Although he described in his deposition what he meant by
that statement, he testified that he did not state the details to
the investigators.  2005 Calhoun Depo. 9-10.  Such a command is a
lawful function of the chief prosecutor and calling for anything
less than in an officer involved in a shooting would abdicate the
public trust.

Plaintiff next cites to evidence that Defendant DDA Calhoun
testified that he met with investigators a number of times, and
the investigators shared their plans and findings with him and in
response he told one investigator "That was good. Keep doing it,"
2005 Calhoun Depo. 17:10-17-18:1-3.  Plaintiff argues this
demonstrates his investigatory involvement.  However, a chief
executives- ultimate command supervision of prosecutorial
investigators does not make the DA an investigator.

Plaintiff also contends that the fact that Defendant DDA
Calhoun reviewed the April 2002 press release before it was

23

finalized and failed to change the language indicating he was a
member of the office performing the investigations (which was
prior to the filing of the charges), is evidence of Defendant DDA
Calhoun's "investigation."   Plaintiff argues the press release of
April 2002, also demonstrates there was a lack of probable cause.
The press release states, "this case is very close, but it is one
which should be submitted to a jury for decision" and "there are
two reasonable interpretations of what the officer did and I
cannot reconcile them."

Defendants contend that the press statement reference to
Defendant DDA Calhoun refers to several members of the District
Attorney's staff, including Defendant DDA Calhoun, researching
the law regarding a police officer's use of deadly force, while
the investigations into the facts of the shooting were done
entirely by Investigator Ponting, Investigator Ebner and the
Lemoore Police Department.   The press release statement was not
intended to mean that Defendant DDA Calhoun personally
participated in the factual investigation of the subject
shooting.   DSUF ##17-18.   While, it has been established that
Defendant DDA Calhoun approved the press release, he did not make
the statement as it was issued by Defendant CDDA Hart.   This
statement cannot be attributed to Defendant DDA Calhoun without
additional evidence of ratification as it was made by Defendant
CDDA Hart.   While prosecuting attorneys issuing press releases
about high profile cases is not per se an activity afforded
absolute immunity, Defendant DDA Calhoun did not author or issue

the press release. *Buckley*, 509 U.S. at 260.[2] Even if he had, the statements are not reasonably susceptible of interpretation that Defendant DDA Calhoun participated in the investigation.

The line between covered and non-covered conduct under absolute immunity is not always clear. The Ninth Circuit case of *Genzler v. Loganbach*, 410 F.3d 630 (9th Cir. 2005) considered the "difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in <u>searching for clues</u> and <u>corroboration</u> that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* at 639 (citing *Buckley*, 509 U.S. at 273). Statements such as "get all the witnesses you can", "that was good. Keep doing it." and do "a thorough investigation" are not activities of initiating prosecution or evaluating evidence, but are no more than encouraging an in-depth objective investigation, including finding corrobative evidence or searching for clues. The Ninth Circuit recognizes that absolute immunity should <u>not</u> apply "[w]hen a prosecutor performs the investigative functions normally performed by a police officer." *Kalina*, 522 U.S. at

----

[2] Plaintiff also claims that Judge Coyle made a factual finding that DDA Calhoun participated in the investigation underlying this criminal prosecution. But as Defendants argue, Plaintiff does not provide any cite to the record where Judge Coyle stated this fact and Defendants contend no such finding by the Court was made in this suit. Plaintiff likewise states that Judge Coyle has identified factual issues pertaining to whether there was probable cause for the Plaintiff's criminal prosecution or whether it was illicitly motivated, but provides no reference for this statement. Defendants contend that it has been unable to locate any such findings by the Court.

126.    Responding to investigators after being advised about progress and steps in the investigations with "That was good. Keep doing it" amounts to the executive's encouragement to investigators to continue their investigation.   When a prosecutor "is organizing, evaluating, and marshaling that evidence in preparation for a pending trial, in contrast to the police-like activity of acquiring evidence which might be used in a prosecution," it is more appropriate to apply absolute immunity. *Genzler*, 410 F.3d at 639 (citations and quotations omitted). When gathering evidence about the incidents from various points of view, such information-gathering function if done at the stage of gathering evidence is not afforded absolute immunity.   If the prosecutor "was engaged in other work that can only be characterized as police-type investigation" then no absolute immunity is afforded.   Reviewing a press statement issued by another District Attorney does not entail evaluating evidence for probable cause or involve initiating a prosecution.

Prosecutors' activities which courts have found were investigative by prosecutors include: engaging in, or authoring and directing an investigative wire tap, *Powers v. Coe*, 728 F.2d 97, 103 (2nd Cir. 1984); *Jacobsen v. Rose*, 592 F.2d 515, 524; giving legal advice to law enforcement officers on the propriety of hypnotizing a suspect and whether probable cause existed to arrest a suspect, *Burns v. Reed*, 500 U.S. 487, 489-490 (1991); and approving a search warrant to assist with a collateral investigation into a new crime.   *KRL v. Moore*, 384 F.3d 110 (9th Cir. 2004), *superceded on other grounds*, 512 F.3d 1184 (9th Cir. 2008).

1    Defendant DDA Calhoun argues that if the latter evidence is

2  not afforded absolute immunity, in the alternative it is afforded

3  qualified immunity.

4    Deciding qualified immunity entails a two-step analysis.

5  First, a court must ask whether a constitutional violation

6  occurred at all.  If the answer to this question is yes, the

7  court must then inquire whether the right violated was "clearly

8  established," by asking whether a reasonable official could

9  believe that the defendant's actions were lawful.  *See Saucier v.*

10  *Katz*, 533 U.S. 194, 201 (2001).  Even without probable cause,

11  qualified immunity may be available if the prosecutor believed

12  that his or her conduct was lawful, in light of the clearly

13  established law and information the prosecutor possessed.  *See*

14  *Peng v. Mei Chin Penghu*, 335 F.3d 970, 980 (2003).  Such an

15  inquiry "must be undertaken in light of the specific context of

16  the case, not as a broad general proposition ... [t]he contours

17  of the right must be sufficiently clear that a reasonable

18  official would understand that what he is doing violates that

19  right."  *Saucier*, 533 U.S. at  201-02 (citation omitted).

20  Although this inquiry is primarily a legal one, where the

21  reasonableness of the officer's belief that his conduct was

22  lawful "depends on the resolution of disputed issues of fact ...

23  summary judgment is not appropriate."  *Wilkins*, 364 F.3d at 1110-

24  11 (citing *Saucier*, 533 U.S. at 216 (Ginsburg J., concurring)).

25  *First Prong of Qualified Immunity Analysis*

26    In the first step of the *Saucier* analysis, a court ruling on

27  a qualified immunity issue, must consider the threshold question:

28  Taken in the light most favorable to the party asserting the

injury, do the facts alleged show the official's conduct violated a constitutional right?  Where the facts are disputed, their resolution and determinations of credibility are manifestly the province of a jury.  *Wall*, 364 F.3d at 1110-1111.  In the second step, the court must ask whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted.

Under the first part of the two-step *Saucier* analysis, Plaintiff must point to evidence that Defendant DDA Calhoun maliciously prosecuted him in violation of his constitutional rights.  While purely investigatory/administrative evidence is not afforded absolute immunity, it also does not establish a malicious prosecution claim.  Importantly, Plaintiff provides no evidence of malice on the part of Defendant DDA Calhoun in making the decision to file the voluntary manslaughter charges.  No evidence has been provided that Defendant DDA Calhoun prosecuted Plaintiff without probable cause.

Probable cause to arrest a person exists when, under the totality of the circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the individual had committed the crime.  *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

Manslaughter is the unlawful killing of human being without malice.  Cal. Penal Code § 192.  A defendant lacks malice and is guilty of voluntary manslaughter upon sudden quarrel or heat of passion or when the defendant kills in unreasonable self-defense-the unreasonable, but good faith belief in having to act in self-defense.  Cal. Penal Code § 192(a); *People v. Lasko*,

1   23 Cal.4th 101, 108 (2000).  Defendant DDA Calhoun contends

2   Plaintiff cannot establish that probable cause to prosecute

3   Plaintiff was lacking; therefore there is no constitutional

4   violation to support a Section 1983 malicious prosecution claim.

5        Based on a review of the shooting investigation, briefings

6   with Investigator Ponting and the "round table" discussions with

7   senior prosecuting attorneys, Defendant DDA Calhoun argues he

8   reasonably believed probable cause existed to prosecute Plaintiff

9   for voluntary manslaughter.  Several witnesses testified to the

10  lack of danger Plaintiff McCabe was in at the time of the

11  shooting, including testimony that Mr. Contreras' car was not

12  close to hitting McCabe and Mr. Contreras' was pulling away from

13  and not toward Plaintiff.  Defendants also assert that the

14  physical evidence, shooting through a side window did not match

15  with Plaintiff McCabe's testimony that he fired through the rear

16  window.  Even if there are alternate theories or explanations, as

17  well as exculpatory evidence that might be offered by Plaintiff,

18  there are undisputed facts that the District Attorney's Office

19  had credible witness statements and physical evidence that

20  established probable cause to believe that Plaintiff McCabe's

21  shooting was legally unjustified.  The decision to prosecute and

22  filing of a criminal complaint are inherently prosecutorial

23  functions which were supported by evidence to raise probable

24  cause to believe Plaintiff had committed the crime of voluntary

25  manslaughter.  Defendant DDA Calhoun's prosecutorial actions and

26  decision-making are afforded absolute immunity.

27       Plaintiff's remaining evidence cited in support of creating

28  a triable issue of fact on his Section 1983 malicious prosecution

claim does not create a genuine issue of material fact that
Defendant DDA Calhoun lacked probable cause to prosecute
Plaintiff, and did so with malice, in an effort to violate
Plaintiff's constitutional rights.  Telling investigators to do a
thorough job, assigning an investigator to investigate, telling
investigators to "let's make sure it's a thorough investigation,"
"That was good. Keep doing it," "get all the witnesses you can,"
and approving a press statement issued by another DDA do not
support a Section 1983 malicious prosecution claim.

Defendant DDA Calhoun also argues that he never drafted
reports, took photographs, nor drew diagrams, demonstrating his
lack of involvement in the investigation.  DSUF ##9-12.
Defendants contend that at no time did DDA Calhoun direct the
District Attorney's Office investigation, nor did he give any
direction to any District Attorney Investigators in terms of how
to conduct the investigation.  DSUF #7.  Defendant DDA Calhoun
also states that he did not file the criminal complaint, did not
appear in court on behalf of the District Attorney's Office
during the subsequent prosecution, and did not actively oversee
CDDA Hart during the handling of the case.  DSUF ##38-39.
Plaintiff's alleged evidence of investigative and/or
administrative activity to change DDA Calhoun's status as a
prosecutor is wholly insufficient.

*Malice or Ill Will*

Plaintiff also has not provided any evidence of malice on
Defendant DDA Calhoun's part, an element of a malicious
prosecution claim.  Defendant DDA Calhoun states that in making
the determination to prosecute Plaintiff, he did not act of

feelings of malice or ill will towards Plaintiff and had never heard of Plaintiff before the incident.  DSUF ##40-41.  Defendant DDA Calhoun argues there is no evidence that he acted with malice or ill will toward Plaintiff.  He did not know Plaintiff McCabe prior to the incident.  A District Attorney, the highest ranking law enforcement in the county, has no incentive to file criminal charges against a peace officer, without probable cause.  A meritless prosecution would be detrimental due to the risk of loss of support for law enforcement and by law enforcement organizations.

Plaintiff has failed to provide any evidence of malice on the part of Defendant DDA Calhoun.  The remaining evidence, telling investigators to do a thorough job, assigning an investigator, telling investigators to "let's make sure it's a thorough investigation," "That was good. Keep doing it," "get all the witnesses you can," and approving another District Attorney's press release, combined with lack of any evidence of ill will, spite, or hatred on DDA Calhoun's part toward Plaintiff is insufficient evidence to survive a § 1983 malicious prosecution claim.

CDDA Hart's conversation with Lemoore Police Officers is not attributable to Plaintiff without additional evidence.  Defendant CDDA Hart was the complaining witness and argued to hold Plaintiff to answer at the preliminary hearing.  His involvement was more direct in prosecuting Plaintiff McCabe than Defendant DDA Calhoun whose involvement ended after the decision was made to charge Plaintiff with voluntary manslaughter.  Defendant CDDA Hart's press statements are of limited use as evidence, as

1  Defendant DDA Calhoun did not make those statements, even if he
2  approved them.  The alleged reference to DDA Calhoun's
3  involvement in the investigation in the press statement, does not
4  prove he so participated or that he lacked probable cause before
5  deciding to charge Plaintiff McCabe.  No constitutional violation
6  has been established.

7  *Second Prong of Qualified Immunity Analysis*

8        Defendants argue that even assuming the Court reaches the
9  second step of the qualified immunity analysis, based on the
10  facts presented by Defendants concerning the circumstances of the
11  shooting, it was reasonable for a prosecuting attorney to make a
12  probable cause determination.  Plaintiff has provided no evidence
13  showing that Defendant DDA Calhoun is "plainly incompetent", or
14  he "knowingly violate[d] the law.".  *Broam*, 475 U.S. at 341.
15  Even if it were concluded that a constitutional right has been
16  established, there is no clearly established case law that such
17  actions of Defendant DDA Calhoun under the totality of
18  circumstances amount to a Section 1983 malicious prosecution
19  claim that violates Plaintiff's constitutional rights.  Qualified
20  immunity applies.

21        The second step in *Saucier* is whether defendant could
22  nonetheless have reasonably but erroneously believed that his or
23  her conduct did not violate the Plaintiff's rights.

24        Plaintiff fails demonstrate that the right at issue here is
25  so clearly established as to allow a reasonable district attorney
26  in Defendant DDA Calhoun's position at the time of the alleged
27  violation to appreciate that his conduct would violate the law.
28  That is, even if the facts described establish a constitutional

32

1  violation, a reasonable official in DDA Calhoun's position could

2  have concluded that his alleged investigative and administrative

3  actions were lawful and did not violate Plaintiff's

4  constitutional rights.

5       In order for a right to be "clearly established," its

6  "contours must be sufficiently clear that a reasonable official

7  would understand that what he is doing violates that right" in

8  that specific situation. *Anderson v. Creighton*, 483 U.S. 635,

9  640 (1987).  It has been held in another circuit that "[i]f case

10 law, in factual terms, has not staked out a bright line,

11 qualified immunity almost always protects the defendant." *Post

12 v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993)

13 (citation omitted).  "This is not to say that an official action

14 is protected by qualified immunity unless the very action in

15 question has previously been held unlawful …; but it is to say

16 that in the light of pre-existing law the unlawfulness must be

17 apparent." *Anderson*, 483 U.S. at 640 (citations omitted).

18      Even if arguendo the alleged administrative/investigative

19 actions do not qualify Defendant DDA Calhoun for prosecutorial

20 immunity, he is entitled to qualified immunity as a reasonable

21 prosecutor could believe that the defendant's actions were lawful

22 and reasonable. *See Saucier*, 533 U.S. at 201.  Defendants motion

23 for summary judgment on Plaintiff's second for the Section 1983

24 malicious prosecution claim is GRANTED, both on qualified and

25 absolute immunity grounds.

26                            <u>CONCLUSION</u>

27      For the reasons stated above, Defendants' Motion for Summary

28 Judgment on Plaintiff's second claim for malicious prosecution as

to Defendant Ronald Calhoun is **GRANTED**.

Counsel for Defendants shall prepare and lodge a form of order and judgment reflecting the ruling made in this Memorandum Decision within 5 days of the filing date of this Memorandum Decision.

IT IS SO ORDERED.

Dated: __August 29, 2008__　　　　　_____**/s/ Oliver W. Wanger**_____
　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

34